**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICTORIA A. LANTHRON, | ) | CASE NO. 3:14-CV-01560 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Victoria A. Lanthron ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

On September 13, 2011, Plaintiff filed her application for SSI, alleging a disability onset date of September 22, 2010. (Transcript ("Tr.") 13.) Plaintiff's claim was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On January 8, 2013, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A vocational expert ("VE") also participated and testified. (*Id.*) On February 7, 2013, the ALJ

found Plaintiff not disabled. (Tr. 10.) On May 16, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On July 15, 2014, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this matter. (Doc. Nos. 15, 19, 20.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in evaluating the opinions of Drs. Haskins and Tangeman; and (2) the ALJ erred in evaluating Plaintiff's testimony.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in January 1978 and was 33-years-old on the date she filed her application. (Tr. 23.) She had a limited education and was able to communicate in English. (*Id.*) She had past relevant work as a housekeeper and a test driver. (*Id.*)

### B. Medical Evidence[1]

#### 1. Medical Reports

On January 7, 2011, Plaintiff had an initial visit with the office of Joseph Spare, M.D. (Tr. 540.) Plaintiff reported that she had previously been diagnosed with depression and

[1] The ALJ found that Plaintiff had the following severe impairments: spinal stenosis, lumbar spine; degenerative joint disease, lumbar spine; status post lumbar decompression surgery; major depressive disorder; generalized anxiety disorder; social phobia; bipolar disorder, mixed, severe without psychotic features; marijuana abuse; and dependent personality disorder. (Tr. 14.) Plaintiff's challenges to the ALJ's decision concern only her mental impairments. Accordingly, the Court will limit its summary of Plaintiff's medical records to evidence of her mental impairments.

bipolar disorder but was no longer seeing her prior psychiatrist due to the company going out of business. (Tr. 540.) Plaintiff stated that she had not taken medication for one year and was experiencing mood swings and depression. (*Id.*) She denied feelings of self harm. (*Id.*) Plaintiff stated that she had been smoking marijuana daily. (Tr. 541.) Christopher J Kalb, CNP, prescribed Lexapro and Tegretol. (*Id.*)

On January 22, 2011, Plaintiff reported feeling better with Lexapro and Tegretol. (Tr. 543.) She exhibited an appropriate mood and affect, with a coherent, appropriately conversant thought process and no suicidal or homicidal ideation. (Tr. 542-544.) At a March 2011 visit with Sophia Sparks, MS, LSW, Plaintiff reported symptoms of depression, difficulty concentrating, anxiety, feelings of worthlessness, and decreased energy. (Tr. 558.) Ms. Sparks noted that Plaintiff's thought process was appropriately conversant; her thought content, mood, and affect were appropriate; and she exhibited no delusional thinking. (Tr. 558-559.) On March 26, 2011, Plaintiff reported continuing mood swings, but Mr. Kalb characterized Plaintiff's depression as well-controlled. (Tr. 561.)

On September 3, 2011, Plaintiff noted that her current medications were working well. (Tr. 599.) She denied depression and feelings of self-harm. (*Id.*) She reported that she had lost her job recently but was babysitting for her brother and liked her job. (*Id.*)

On September 17, 2011, Plaintiff reported to Ms. Sparks that she quit her job babysitting because it was very stressful. (Tr. 605.) Plaintiff reported having "stomach problems" as a result of dealing with people and crowds. (*Id.*) Ms. Sparks found that Plaintiff's thought content, mood, and affect were appropriate. (Tr. 603.)

On October 29, 2011, Plaintiff reported that her current medications were working well. (Tr. 622.) She stated that she had been getting along much better with her

significant other. (*Id.*) She denied depression, anxiety, mood swings, and feelings of self-harm. (*Id.*) A few days later, Plaintiff reported feelings of joylessness and anxiety, partially as a result of a child custody dispute with her ex-husband. (Tr. 626.) Her mood, affect, speech, thought process, and thought content were appropriate. (*Id.*)

On November 11, 2011, Dr. Spare conducted a Minnesota Multiphasic Personality Inventory (MMPI-2) test. (Tr. 639.) Plaintiff reported that she generally felt depressed, withdrawn, irritable, and edgy. (*Id.*) She stated that she tended to worry obsessively about a wide range of issues. (*Id.*) Plaintiff did not have any hallucinations and did not exhibit any delusional thinking, and she had only very mild difficulties with attention and concentration. (*Id.*) Based on Plaintiff's test results, Dr. Spare's diagnostic impressions included major depressive disorder, generalized anxiety disorder, social phobia, and possible panic disorder with agoraphobia. (Tr. 641.) Dr. Spare recommended continuing individual therapy aimed at stress management and problem-solving training, with psychiatric medication management and help from a drug and alcohol specialist. (*Id.*)

On December 10, 2011, Plaintiff reported to Mr. Kalb that she liked Prozac but needed an increased dose to address her depressed mood. (Tr. 645.) She denied feelings of self harm and anxiety, and stated that she was getting along well with her boyfriend. (*Id.*) Plaintiff reported that she was doing better overall. (*Id.*)

In January 2012, Plaintiff reported that she had not been taking her Prozac as prescribed. (Tr. 653.) Her mood, affect, and thought content were appropriate, and her thought content was coherent and appropriately conversant. (*Id.*) She stated that she had a slightly depressed mood and slight anxiety, but she denied feelings of self harm and stated that she was getting along well with her boyfriend. (*Id.*)

In February 2012, Plaintiff expressed to her care providers symptoms of depression accompanied by an idea of committing suicide and "taking her children with her." (Tr. 656.) Plaintiff was admitted to Marion General Hospital and reported that her condition had deteriorated after being taken off Paxil and put on Prozac due to insurance issues. (*Id.*) Plaintiff admitted to using her boyfriend's Adderall prescription and smoking marijuana, and she stated that she had been stressed by custody issues with her ex-husband. (Tr. 654, 656.) Plaintiff's intake provider reported that Plaintiff had limited insight and poor judgment; she was tearful and agitated; and she could not assure her own safety, although she had no delusions or hallucinations and was oriented and in no acute distress. (Tr. 656.) Plaintiff was diagnosed with bipolar disorder, mixed, severe, without psychotic features; and marijuana abuse. (Tr. 657.) Plaintiff was discharged on March 2, 2012, in improved condition. (Tr. 655.) Her care providers reported that she had adjusted to the unit and had become much less anxious when, during her hospitalization, she and her ex-husband came to an arrangement regarding custody. (Tr. 655.)

**2. Agency Reports**

On October 12, 2011, state agency psychologist Kristen Haskins, Psy.D., independently reviewed Plaintiff's medical records and opined that Plaintiff was moderately limited in: performing activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. (Tr. 82.) Dr. Haskins further opined that Plaintiff could complete tasks in a setting that did not require close, sustained focus or attention or a sustained fast pace; that she could perform work limited to one to three-step work tasks in an environment with infrequent change; and that she should have only occasional and superficial interactions with the general public. (Tr. 87-88.)

On February 2, 2012, state agency psychologist Paul Tangeman, Ph.D., independently assessed the evidence of record and opined that Plaintiff had moderate difficulties in her activities of daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 97.) Dr. Tangeman further opined that Plaintiff could understand and remember simple, routine, one to three-step tasks in an environment where change was infrequent; she could complete tasks in a setting that did not require close sustained focus or a sustained fast pace; she should avoid high-social situations; she would do best in an environment with no public demands; and she should avoid public contact and other social interactions should be occasional and superficial. (Tr. 101-102.)

**C. Hearing Testimony**

**1. Plaintiff's Hearing Testimony**

Plaintiff lived in a house with her boyfriend and two 11-year-old children. (Tr. 37-38.) She testified that on a typical day, she watched TV, listened to music, did chores around the house, and helped her children with their homework. (Tr. 38.) Plaintiff also went camping and fishing. (Tr. 39.) She testified that until it got cold, she went fishing about three times per week. (*Id.*) Plaintiff played frisbee golf on the Wii every day with her children. (*Id.*) She stated that she did her grocery shopping at night because she did not like crowds. (Tr. 46.)

Plaintiff was diagnosed with bipolar disorder and depression. (Tr. 47.) She stated that there were at least 10 days per month when she would stay in her room and not talk to anyone. (Tr. 47-48.) Plaintiff testified that she could no longer work because she had "trouble accepting the consistency of going in and the pressure of it and expectation–I

don't know how to say that word, but what people expect of me. I try to push myself and I always feel that I don't do good enough. And it makes me sick." (Tr. 40.)

**2. Vocational Expert's Hearing Testimony**

Jamie Massey, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who could perform a limited range of light work. (Tr. 61.) The individual could frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold, humidity, and vibration; and must avoid all exposure to heavy equipment requiring frequent turning, twisting, and bending of the lumbar spine. (*Id.*) The individual could perform unskilled simple, routine, and repetitive tasks that require little independent judgment or decision-making. (Tr. 62.) The individual must work in an environment where there is little change in terms of tools, processes, or setting and change where necessary is introduced gradually. (*Id.*) She must work in an environment that does not have stringent production or speed requirements and thus may not perform fast-paced assembly line work. (*Id.*) Furthermore, the individual may have only superficial contact with coworkers and supervisors and occasional and superficial contact with the public. (*Id.*) The VE testified that the hypothetical individual would be capable of performing such jobs as a housekeeper (Dictionary of Occupational Titles (DOT) #323.687-014), garment sorter (DOT #222.687-014), and mail clerk (DOT #209.687-026). (Tr. 62-63.)

## III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R.

§§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 13, 2011, the application date.

2. The claimant has the following severe impairments: spinal stenosis, lumbar spine; degenerative joint disease, lumbar spine; status post lumbar decompression surgery; major depressive disorder; generalized anxiety disorder; social phobia; bipolar disorder, mixed, severe without psychotic features; marijuana abuse; dependent personality disorder.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, crouch, or crawl; must avoid concentrated exposure to extreme cold, humidity, and vibration; must avoid all exposure to heavy equipment requiring frequent turning, twisting, or bending of the lumbar spine; is able to perform unskilled simple, routine, and repetitive tasks that require little independent judgment or decision making; must work in an environment where there is little change in terms of tools, processes, or setting and change where necessary is introduced gradually; must work in an environment that does not have stringent production or speed requirements and thus may not perform fast paced assembly line work; may have superficial contact with coworkers and supervisors and occasional and superficial contact with the public.

5. The claimant is capable of performing past relevant work as a test driver (DOT 919.683-014), SVP2, unskilled, light work performed at sedentary. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

6. The claimant has not been under a disability, as defined in the Social Security Act, since September 13, 2011, the date the application was filed.

**LAW & ANALYSIS**

**A. Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. The ALJ Erred in Evaluating the Opinions of Drs. Haskins and Tangeman.**

In October 2011, state agency psychologist Kristen Haskins opined, in part, that

Plaintiff was moderately limited in her ability to maintain social functioning and that she should have only occasional and superficial interactions with the general public. (Tr. 82, 87-88.) In February 2012, state agency psychologist Paul Tangeman concluded that Plaintiff had marked limitations in maintaining social functioning; she should avoid public contact; and other social interactions should be only occasional and superficial. (Tr. 97, 101-102.) In determining Plaintiff's residual functional capacity (RFC), the ALJ gave "substantial weight" to the opinions of Drs. Haskins and Tangeman. Plaintiff maintains that the ALJ erred, because she failed to account for Dr. Tangeman's more severe limitations with regard to Plaintiff's impairments in social functioning despite assigning his opinion substantial weight. For the following reasons, Plaintiff's argument lacks merit.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."). Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the ALJ limited Plaintiff to superficial contact with coworkers and

supervisors and occasional and superficial contact with the public. (Tr. 18.) Because the ALJ's calculation of Plaintiff's RFC was less restrictive than Dr. Tangeman's RFC assessment, and, therefore, contradicted Dr. Tangeman's opinion, S.S.R. 96-8p required the ALJ to explain her decision not to include Dr. Tangeman's limitation of Plaintiff to no general public contact and only occasional and superficial interactions with all others. In her hearing decision, the ALJ complied with S.S.R. 96-8p, explaining:

> In February 2012, Paul Tangeman, Ph.D. opined that the claimant had moderate limitations in activities of daily living, marked limitations in social functioning, moderate limitations in concentration, persistence, or pace and had experienced 1-2 episodes of decompensation of extended duration. Dr. Tangeman opined that the claimant was limited to . . . no general public contact and that all other social interactions should be occasional and superficial. . . . Based on the claimant's testimony that she is able to drive, go camping and fishing, and only occasionally wants to socially isolate, the undersigned finds the claimant has only moderate limitations in social functioning. The objective medical evidence indicates that the claimant could have superficial contact with supervisors and coworkers and occasional and superficial contact with the public.

(Tr. 22.) While the ALJ gave Dr. Tangeman's opinion "substantial weight," she was not required to adopt the opinion in its entirety. Furthermore, as the Commissioner notes, the ALJ's findings diverged from Dr. Tangeman's only as to the specifics of Plaintiff's social interactions, and the ALJ adequately called attention to this discrepancy and explained why she found record support for only *moderate* limitations in social functioning. Even at step three of the sequential evaluation process, when determining whether Plaintiff's impairments met or equaled the criteria of a listed impairment, the ALJ discussed the evidence she considered in finding that Plaintiff was only moderately limited with regard to social functioning:

> In social functioning, the claimant has moderate difficulties. At the hearing, the claimant testified that her daughter plays the flute and that she goes to her daughter's concerts. She stated that she goes camping with her family about 3 times a year and goes fishing with her family about 2-3 times a week until it gets cold. She stated that she plays Yahtzee and Wii games with her children. The claimant testified that at least 10 days a month she does not want to be around anyone. She stated that she occasionally contemplated suicide (Hearing Testimony). The "Function Report" stated that the claimant engaged in no social activities other than going to the doctor (Ex. 11E).

(Tr. 17.)

The ALJ adequately discussed her reasons for limiting Plaintiff to superficial contact with coworkers and supervisors and occasional and superficial contact with the public. In making this determination, the ALJ incorporated some, though not all, of Dr. Tangeman's opinion that Plaintiff was limited to no general public contact and occasional superficial contact with others. In doing so, she ascertained based on Plaintiff's activities of daily living, her hearing testimony, and the objective medical evidence, the extent of Plaintiff's social limitations. (Tr. 17-18.) As the ALJ's RFC determination is supported by substantial evidence, and she adequately explained how it diverged from Dr. Tangeman's opinion, the ALJ did not err in evaluating the opinions of the state agency consultants.

**2. The ALJ Erred in Evaluating Plaintiff's Testimony.**

At Plaintiff's hearing, she testified that her bipolar disorder and major depressive disorder caused her to experience "black days" when she secluded herself from everyone. (Tr. 47.) She stated that she experienced black days at least 10 days out of the month. (*Id.*) On those days, she closed herself in her room, did not talk to anyone, and would not eat. (Tr. 48.) In her hearing decision, the ALJ noted that Plaintiff "occasionally wants to isolate herself" and "only occasionally wants to socially isolate." (Tr. 21, 22.) Plaintiff

argues that the ALJ erred by equating Plaintiff's reported tendency to self-isolate ten or more times per month to an occasional basis. For the following reasons, remand is necessary to clarify this issue.

The ALJ specifically acknowledged Plaintiff's testimony that she experienced black out days at least 10 days out of the month, stating: "The claimant testified that at least 10 days a month she does not want to be around anyone." (Tr. 16-17.) Later in her decision, however, the ALJ refers to Plaintiff's black out days as occurring only occasionally, stating that Plaintiff "occasionally wants to isolate herself" and "only occasionally wants to socially isolate." (Tr. 21, 22.) While the ALJ explicitly acknowledged that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible," the extent that the ALJ accepted, discounted, or rejected Plaintiff's testimony regarding her need to self-isolate at least 10 days per month is not entirely clear. (Tr. 18.) Indeed, the ALJ refers to Plaintiff's episodes of self-isolation three separate times in her opinion and at least arguably appears to accept Plaintiff's testimony that there are some days when she completely secludes herself from others. It is unclear, though, whether the ALJ accepts Plaintiff's testimony that these black out days occur at least 10 days per month. The ALJ does not explain whether she equated Plaintiff's reports of at least 10 black out days per month to an occasional basis, nor does the ALJ define the term "occasionally."[2]

[2] According to Plaintiff, the Social Security regulations define "occasional" to mean "cumulatively 1/3 or less of an 8 hour day." (Plaintiff's Brief ("Pl.'s Br.") 13.) Thus, Plaintiff concludes that her testimony "was that she self-isolated **at least** one-third of the time, and the ALJ accepted and relied upon her testimony but materially misrepresented [Plaintiff's] report to mean **up to** one-third of the time." (Pl.'s Br. 14) (emphasis in original). Defendant responds that in describing Plaintiff's episodes of self-isolation as "occasional,"

Given the lack of clarity in the ALJ's opinion, Plaintiff's case must be remanded for the ALJ to explain whether she found Plaintiff's testimony regarding the frequency of Plaintiff's need to self-isolate to be credible. If the ALJ finds that Plaintiff's testimony is not fully credible, she must adequately explain the basis for her credibility finding. On the other hand, if the ALJ adopts Plaintiff's testimony that she experiences black out days at least 10 days per month, the ALJ must explain whether Plaintiff is nonetheless capable of sustaining full-time work in light of the VE's testimony that "[i]n terms of absences, tardiness, leaving work early, employers typically do not tolerate greater than two absences per month." (Tr. 68.) Furthermore, if the ALJ describes Plaintiff's episodes of self-isolation as "occasional," the ALJ must further define that term.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 19, 2015

the ALJ was not using the term as it is defined in the Social Security regulations, but rather was "simply distinguishing Plaintiff's subjective complaints regarding occasional (i.e., intermittent, non-continuous) self-isolation from subjective complaints that purport to describe behavior in effect at all times." (Defendant's Brief ("Def.'s Br.") 18.) According to Defendant, the applicable Social Security rulings describe "occasional" activities in the context of assessing functional limitations during the workday, and therefore the definition does not override the everyday definition of the word when used in another context. This Court will not assume or decide how the ALJ defined the word "occasional" when describing Plaintiff's episodes of self-isolation, as the overriding issue here is whether the ALJ found Plaintiff's testimony that she self-isolated 10 or more days per month credible. Nevertheless, it would be helpful on remand for the ALJ to clarify the use of the word "occasional" and indicate whether it is intended to have the meaning set forth in S.S.R. 96-9p.